Capital Reporting Company
J. Strother

3 (Pages 6 to 9)

### Page 6

1  Q  When you say some college, would you describe
2  what that means?
3  A  I went to NOVA. I took classes in Parks and
4  Recreation. I got maybe nine credits left before I can
5  get a degree.
6  Q  I take it this is your first deposition.
7  A  No. I have given a couple before.
8  Q  What were the circumstances of those
9  depositions?
10 A  They were car accidents.
11 Q  Did they involve lawsuits?
12 A  Yes, they were.
13 Q  Did they go to trial?
14 A  Not that I know of.
15 Q  Were they lawsuits where you were the
16 plaintiff or were you the defendant?
17 A  I was the defendant.
18 Q  Do you know where they were pending?
19 A  Here.
20 Q  Here in Arlington or Fairfax?
21 A  Arlington.
22 Q  Both were in Arlington?

### Page 7

1  A  I do believe so.
2  Q  You don't recall going to court, so I assume
3  that --
4  A  I don't recall ever going to court over them,
5  but I could be wrong. Its been 40 years or more.
6  Q  Okay. It was back when you were --
7  A  When I was a teenager.
8  Q  Have you ever been convicted of a crime?
9  A  Yes, I have.
10 Q  What's that?
11 A  Possession of marijuana.
12 Q  When was that?
13 A  Oh, good gravy, I can't recall. It was
14 probably 1980-something.
15 Q  In the late 80s?
16 A  In the late 80s, yeah.
17 Q  Was that charge dismissed?
18 A  I had paid some type of fine for it. I think
19 my rights had been suspended and I got them back. I
20 can't recall exactly what all went down at that time.
21 A lot of things were going on.
22 Q  Do you remember if it was a misdemeanor

### Page 8

1  possession of marijuana or a felony possession?
2  A  I think it was a misdemeanor, but I had charge
3  prior for cocaine that came back up on it.
4  Q  Was this is in Arlington County?
5  A  No, Loudoun County.
6  Q  Tell me about the cocaine charge.
7  A  The cocaine charge was about that I was with a
8  young lady and she had cocaine with her. She was in my
9  car so I was charged with possession of it.
10 Q  Was that in Loudoun County?
11 A  No, that would've been Fairfax.
12 Q  So that was in Fairfax. So you got the
13 possession of marijuana while you were on probation for
14 the cocaine charge?
15 A  Apparently.
16 Q  So that netted you a conviction on the cocaine
17 charge.
18 A  Right.
19 Q  As well as the marijuana charge.
20 A  Right.
21 Q  Was the cocaine charge a felony?
22 A  I think so. I don't know. I can't recall. I

### Page 9

1  think it is. I think cocaine is a different
2  classification than marijuana and so therefore, it has
3  a harder penalty. If I could live my life over again,
4  I definitely would've stayed away from those people.
5  Q  I hear you.
6  A  But I can't, so I've learned from it.
7  Q  On the marijuana charge, were you actually
8  smoking the drug when you were arrested?
9  A  No.
10 Q  How was it in your possession?
11 A  It was in a jacket pocket.
12 Q  Are you currently smoking marijuana?
13 A  No, I'm not.
14 Q  When was the last time you smoked marijuana?
15 A  Probably about three years ago.
16 Q  So you're clear-headed today.
17 A  Oh, yes.
18 Q  You got your Coca-Cola. You got your caffeine
19 going.
20 A  My caffeine and my cigarettes are my only
21 drugs these days. I don't drink alcohol. I don't do
22 any of that stuff.

**EXHIBIT V**

Capital Reporting Company
J. Strother

4 (Pages 10 to 13)

## Page 10

1  Q  Good for you. I still have a weakness for
2  wine. Those are all the preliminary questions. Let
3  get to the meat of the thing. I have a series of
4  surveys here that I wanted to ask you some questions
5  about.
6      MR. RINALDI: Mark, what'll say is if the 11
7  x 17 that you have that you are going to mark as
8  Exhibit A is too small to be legible for Mr. Strother,
9  I've brought the larger print of it that we can also
10 refer to. It's up to you.
11     MR. CUMMINGS: This is why I like these guys.
12 Let's open the larger one up and let him look at it.
13     MR. RINALDI: This is my only print of the
14 larger one.
15     MR. CUMMINGS: Let's have her mark this as
16 Exhibit A, but we'll refer to this big one.
17     MR. RINALDI: Okay. If he needs to make a
18 mark on it during the deposition, I would just ask that
19 he mark the smaller one.
20     MR. CUMMINGS: Yeah, okay.
21     MR. RINALDI: If this is the one that you got
22 from us, if this is the digitized version of it, the

## Page 11

1  only difference is that what you're presenting is one
2  that wasn't signed by the surveyor. The one we're
3  referring to, the larger one, is signed and dated by
4  the surveyor. The exhibit is not, but I'm not aware of
5  any other differences in the survey, and that's just
6  because the surveyor provided this to me in digital
7  format and that's where I printed it from. Is that
8  clear? Can we live with that?
9      MR. CUMMINGS: Yeah. You made a beautiful
10 record for me. Thank you. Let's mark this as Strother
11 Exhibit 1.
12     (Strother Exhibit Number 1 was
13     marked for identification.)
14 BY MR. CUMMINGS:
15 Q  You're looking at Strother Exhibit 1. Can you
16 find the property that you or your family owned?
17 A  Right here. This should be my driveway and
18 that should be my building.
19 Q  Draw a circle around your driveway.
20 A  Just around the driveway?
21 Q  Yes.
22 A  (Witness complies.)

## Page 12

1  Q  That driveway is to the immediate right of
2  what I guess is the house that the Lee had.
3  A  Two-story building.
4  Q  We sometimes refer to it as the Reamy property
5  because that's who owned it before the Lees
6  A  Well, that's interesting. I wouldn't know
7  that information.
8  Q  Do you recognize that as the two-story
9  building next to the driveway that the Lees own?
10 A  Right. Grandpa Lee and Grandma Lee lived up
11 on the second floor of that building when we first
12 bought.
13 Q  What year was that?
14 A  1978, I guess. I don't know.
15 Q  Late 70s is your best guess.
16 A  Late 70s, early 80s. My paint fumes did a
17 number on my memory. It was like sniffing airplane
18 model glue.
19 Q  All right. Since you mentioned memory, you
20 telling me you worked around paint fumes for how many
21 years?
22 A  Thirty-three years.

## Page 13

1  Q  And it affected your long-term memory?
2  A  Well, it affected some of my memory. Long-
3  term: not really.
4  Q  Okay.
5  A  Short-term memory: oh, yeah.
6  Q  Let's check your long-term memory now. Can
7  you highlight -- let me get a highlighter. Can you
8  highlight your property on the smaller exhibit?
9  A  Okay. (Witness complies.) Will that do you?
10 Q  That's fine. I noticed on your highlighting
11 that you put a circle around the driveway as well. Did
12 you own the driveway?
13 A  We owned the driveway. It was on our title as
14 owning it. When we got it, it had nothing stating of
15 any easement except for the electric and telephone
16 lines.
17 Q  Well, we'll talk about that in a minute. I
18 have some documents that might disabuse you of that.
19 This is fine. Your answer is you owned the driveway
20 and you owned this property here.
21 A  Yes.
22 Q  I noticed on the corner it's a long,

Capital Reporting Company
J. Strother

7 (Pages 22 to 25)

Page 22

1   A   Correct.
2   Q   Is there a door back there?
3   A   Oh, yes. There is a garage door plus a
4   regular office door and then there is a walkway that
5   goes back to the backside of Madhuban Restaurant and
6   American Shoe Repair. So there are several doors on
7   the backside.
8   Q   Okay. Let's mark this as Strother 3.
9       (Strother Exhibit Number 3 was
10      marked for identification.)
11  Q   I think this photograph was taken either in
12  the late 90s or the early 2000s. I'd ask you if you
13  recognize that photograph.
14  A   I recognize it. The car that is sitting there
15  would be my father's Oldsmobile that I got after he
16  passed away.
17  Q   The black car there?
18  A   Well, it's actually a dark blue.
19  Q   There's a garage door back here.
20  A   The garage door is right there.
21  Q   Put an X where that garage door is.
22  A   Let me put a line first to indicate about

Page 23

1   where they are.
2   Q   That's even better. Put two lines to put in
3   for the garage door --
4   A   And right there is the garage door. There are
5   two windows right here and then there is a doorway
6   right here.
7   Q   Good. So the windows and the door are on this
8   little cut-out piece that we talked about.
9   A   Yes. This is a short wall if you want to call
10  it that.
11  Q   Do you see the little fence here?
12  A   Yes.
13  Q   Do you know about when that was put up?
14  A   I do not recall. I was busy on a USIA job,
15  multiple $10,000 job, or something like that, that my
16  father and I were producing.
17  Q   If I told you it was constructed in the mid-
18  90s, would you have anything to contradict that?
19  A   No, I wouldn't.
20  Q   Prior to that fence being put up, where did
21  you park?
22  A   I parked a little bit farther up than where

Page 24

1   the fence is, probably another foot. And then Don
2   showed up with his Suburban and he was getting
3   complaints from the county for hanging the Suburban
4   over the sidewalk on Irving Street and they asked us if
5   I wouldn't mind pulling my truck back some so that they
6   could fit in. Being neighborly, I agreed to it. You
7   don't fight with your neighbors. They're the worst
8   people to be fighting with.
9   Q   I hear you. Do you have any information as to
10  why this fence was put up?
11  A   Mr. Lee was concerned about security. The
12  main thing was that the man who was running Madhuban
13  Restaurant, his delivery people would back in over his
14  lot up to the back door of their place to unload. It
15  was fine and dandy until Don started showing up earlier
16  in the morning and blocking the man in.
17  Q   Okay. Do you recall any issues with respect
18  to Madhuban using these dumpsters?
19  A   They never used those dumpsters.
20  Q   What did they use for their trash?
21  A   They had a regular rolling trash can that
22  another trash man came up and took the trash from.

Page 25

1   Q   All right.
2   A   Plus they had their own oil drum drawn back
3   there on the back door.
4   Q   They had an oil drum back there?
5   A   Yes.
6   Q   What did they use the oil drum for?
7   A   For cooking oil.
8   Q   And they'd dump it there?
9   A   They'd dump it there and Valley Proteins would
10  come along every month or so and trade 55-gallon drums.
11  Q   All right. There were no windows on this
12  side, correct?
13  A   No windows at all on that side.
14  Q   So you wouldn't be able to see the dumpsters
15  or see any activity.
16  A   Oh, there is one window back here on the very
17  back side where the bathroom is where we had an exhaust
18  fan, but you don't see anything out of it. The
19  building is gone now so I can't show you.
20  Q   That's why we're going through this exercise.
21  Did Madhuban have access out here? I'm pointing to the
22  area here at the corner of the building right in front

Capital Reporting Company
J. Strother

9 (Pages 30 to 33)

### Page 30

1  A  Right.
2  Q  You mentioned your dad Channing died ii99
3  and your mom died in 2000. Is that right?
4  A  Correct.
5  Q  Did you become the owner after your mom died?
6  A  Correct. My brothers tied it up for a while.
7  Q  How did your brothers tie it up?
8  A  They're greedy.
9  Q  Your brothers are greedy?
10 A  Darn right they are.
11 Q  And your brothers being Channing. What the
12 other brother's name?
13 A  Thomas L. Strother.
14 Q  Are they both in the area?
15 A  Channing is over in Bethesda. He works in
16 Washington, D.C. with a law firm. He's an
17 environmental lawyer. My younger brother is a software
18 manufacturer out in California.
19 Q  And his name is Thomas?
20 A  Tom. Thomas.
21 Q  All right. Let's come back to this greed you
22 were talking about. Why do you say that they were

### Page 31

1  greedy?
2  A  Well, they tried to get me to throw in
3  everything that was being left to me from my parents
4  estate into a common thing and to split three ways,
5  instead of doing what the Will had stated.
6  Q  What did the Will state?
7  A  The Will stated that I was to get X amount of
8  properties. I didn't get all the properties that I was
9  supposed to get.
10 Q  You got this property though.
11 A  Oh, yes. It took me a real fight for that.
12 Q  Did you have to hire an attorney?
13 A  No. I just told them I was going to hold off
14 the back doors to the two storefronts since I owned the
15 back straight out.
16 Q  What do you mean when you say you own the back
17 straight out?
18 A  When my father passed away, it was left in his
19 Will that I was to obtain the shop property. I already
20 owned half of it.
21 Q  You were clear that you had a legal right to
22 the shop property.

### Page 32

1  A  Correct.
2  Q  And your dad wanted to make sure --
3  A  That I had my business and that I could
4  continue working. He knew that my brothers would try
5  to do what they tried to do. So after my father died,
6  I had the 1126, the garage with the driveway and the
7  two storefronts were still in my mother's name. My
8  brothers were like, oh, we want this amount of money,
9  and they tried to set a value on it and tried to equal
10 out the estate so the three of us got an equal share.
11 Q  Do you know if there was trust at all that
12 your parents had set up?
13 A  I have no clue.
14 Q  No clue one way or the other.
15 A  No clue.
16 Q  Were there other properties that your parents
17 had in the area?
18 A  Oh, yes. They had a house up on North Nelson
19 Street in Arlington, semi-detached.
20 Q  Who got that?
21 A  My older brother Channing.
22 Q  What else?

### Page 33

1  A  They had a house on North Winchester Street.
2  That was another semi-detached house. I got that one.
3  Q  Anything else?
4  A  The house on Chestnut Hill Avenue was split
5  between Tom and Channing. The Loudoun County property,
6  25 acres, that was split three ways. The house that I
7  was living in on North Seventh Street came to me. That
8  was my father's house. I think that was about it.
9  Q  Okay.
10 A  Oh, we owned land in Front Royal that was in
11 partnership with my Uncle Bill, who was in Fairfax
12 County zoning back in the 60s.
13 Q  Well, it sounds like you did pretty well.
14 A  My father did well.
15 Q  I'm sorry, in terms of the split between you,
16 Channing and Thomas, it sounds like you got either an
17 equal or more than an equal share of the properties.
18 A  There was a lot of cash involved also and
19 stuff like that.
20 Q  Did you all get appraisals and tried to work
21 it out?
22 A  We had appraisals and it was all in

Capital Reporting Company
J. Strother

10 (Pages 34 to 37)

Page 34

1  speculation. We had a couple of; Oh, in a couple of
2  years it's going to be worth this. No, I want to know
3  what it's worth today, not in a couple of years.
4     Q  Okay. So you were able to resolve this
5  dispute or misunderstanding with your brothers without
6  having to litigate it, correct?
7     A  Correct.
8     Q  Well, that's laudable. Nobody had to hire
9  lawyers and draw down.
10    A  No. Channing is a lawyer himself and that put
11 me at a disadvantage, but you don't fight with your
12 family. You fight with them, but you don't fight with
13 them. You know what I mean?
14    Q  Well, if you don't litigate, I consider that
15 an agreeable settlement.
16    A  That's exactly right. Who wants to spend
17 $100,000 on a $10,000 piece of property? You don't do
18 that. You know? It's family; you gotta keep things
19 going. After everything is settled we're still
20 friends.
21    Q  So you're not aware of any transactions or
22 event that happened on December 18, 1998 regarding this

Page 35

1  property?
2     A  No.
3     Q  With respect to a trust.
4     A  No.
5     Q  Do you know when this property was built?
6     A  No, I do not.
7     Q  Okay.
8     A  I don't know, but I know that I was told that
9  Jimmy Dean practiced in that building when he had a
10 band.
11    Q  Is that right?
12    A  That's correct. In that house next door that
13 was torn down that the Fadoul's owned, he lived in
14 that.
15    Q  Jimmy Dean, eh?
16    A  Yeah.
17    MR. RINALDI:  Do you think we should subpoena
18 him?
19    Q  You may want to put a plaque. When ZOM gets
20 the building there, they may want to put a plaque
21 there.
22    A  All I can say is that is rumor. I don't

Page 36

1  know. I wasn't alive at that time. My father was, but
2  I wasn't.
3     Q  You remember there used to be a tower there
4  where Jimmy Dean broadcast his music.
5     A  Right.
6     Q  So you're telling me Jimmy Dean used to live
7  here.
8     A  He used to live here.
9     Q  Oh, on this property that's now gone.
10    A  Right.
11    Q  You're pointing to north of the trees on this
12 photograph, exhibit three.
13    A  Right.
14    Q  There came a time when you sold your property;
15 is that correct?
16    A  Well, yes.
17    Q  When was that?
18    A  Oh, good gravy. I couldn't tell you. It
19 must've been 2005. 2004, I guess it was. I couldn't
20 tell you when I sold it because so much was going on
21 and I was just trying to get my life back together
22 again. It was hard enough fighting with the family and

Page 37

1  then finding out that the chemicals in my shop were
2  killing me.
3     Q  Well, I'm glad you got that straightened out.
4  Mr. Strother, I don't have a problem with it. I don't
5  know if Mr. Rinaldi does, but sometimes you talk when
6  there's not a question. It's okay with me, okay. If
7  Mr. Rinaldi doesn't have an objection, if you think of
8  something, just go ahead and throw it on the record for
9  us.
10    MR. RINALDI:  I'll object when you start to
11 say something I disagree with.
12        (Strother Exhibit Number 4 was
13        marked for identification.)
14    Q  I'm going to show you a document that has been
15 marked as Strother Exhibit Number 4. I'll ask that you
16 take a look at it and see if you can identify it.
17    A  It looks like what I signed when I sold the
18 property to Faison in 2006. That's probably right.
19    Q  What was the price of that property?
20    A  $1.15 million. One million, one hundred and
21 fifty thousand dollars.
22    Q  Did you have an appraisal before you sold the

Page 38

1  property?
2    A  No, I did not.
3    Q  How do you know you got the value of the
4  property if you didn't have an appraisal done?
5    A  Because that's what I wanted for it.
6    Q  Good enough for me.
7    A  Faison came to me and said they wanted my
8  property and they asked me how much I would sell it
9  for. I told them $1.2 million. It lasted almost a
10 year in negotiations; I walked away with $1.15 million.
11 That's what I wanted for it and they were willing to
12 pay it, so I sold.
13   Q  And that deed reflects that transaction.
14   A  I do believe so.
15   Q  I offer all these as exhibits for purposes of
16 admissibility since you've identified them.
17        MR. RINALDI: Well, are we -- let's go off the
18 record for a minute.
19        (Discussion off the record.)
20        MR. CUMMINGS: At this time, given the
21 identification and the testimony, I would like to offer
22 exhibits one, three, and four into evidence. Well

Page 39

1  reserve on exhibit two, but that's also part of the
2  deposition record.
3        MR. RINALDI: Okay.
4        MR. CUMMINGS: Let's take a little break and
5  we'll resume in a few minutes.
6        (Whereupon, a brief recess was taken.)
7  BY MR. CUMMINGS:
8    Q  Let me just ask you some general questions
9  about when you worked there. Generally, what were your
10 hours?
11   A  Well, my father got in usually about 7:00 a.m.
12 He was an early bird. I usually showed up by 8:30. My
13 father would leave somewhere around 2:00/3:00, being an
14 elderly man that he was, he'd go home. He was retired
15 as the Postmaster of Arlington, he was entitled to. I
16 stayed until about 4:30/5:00 sometimes. When he was
17 ailing, I was there until 7:00 or 8:00 at night. Many
18 times I would come back in and work a couple of hours
19 from 10:00 to midnight when it was most quiet in there
20 to do work for preparing for the next day.
21   Q  Okay. And that's pretty labor intensive work
22 doing this silk-screening.

Page 40

1    A  Oh, yes. All labor.
2    Q  And you're working on tables, working over
3  art.
4    A  Correct.
5    Q  And it's pretty constant. You have to pay
6  attention to what you're doing; is that correct?
7    A  Oh, yes, indeed. It's all manual work. All
8  hands-on work.
9    Q  What type of chemicals were you working with?
10   A  Oil-based paints.
11   Q  Acetone?
12   A  Acetone, lacquer thinners, Xylene were my
13 solvents. For oil-based paints, enamel, poster ink,
14 vinyl ink. Vinyl ink is what binders are made out of,
15 bumper stickers are made out of. They are highly toxic
16 and flammable, intoxicating fumes. It's worse than
17 gasoline.
18   Q  Right. And you attribute breathing all those
19 chemicals in that confined space is affecting your
20 memory?
21   A  Not affecting my memory, affecting my health.
22 In a way it may have affected my memory, but not about

Page 41

1  property lines and stuff.
2    Q  Oh, I'm not concerned about the property lines
3  because we have surveys.
4    A  It affected me when I was making estimates for
5  doing jobs. The fumes in there, you know, I always had
6  to go back a third time to make sure my figures were
7  right.
8    Q  I see. I'm just noticing, it looks like this
9  little walkway is on the bigger version of exhibit one.
10 Is this the little walkway you were talking about?
11   A  That's correct.
12   Q  It says EX.CON.
13   A  That's exterior concrete walkway.
14   Q  And that's a little walkway that gave access
15 to the Indian restaurant, and I guess into your office.
16   A  No. It went into the American Shoe Repair.
17   Q  All right. What access did Madhuban have to
18 the rear of the property?
19   A  This is the back door to Madhuban.
20   Q  Oh, I'm sorry. All right.
21   A  It's where the 4.6 is.
22   Q  Correct.

Page 74

1  through the county.
2  Q  Okay. Anything else? I think we're finished.
3  A  If Don had said that they had an easement in
4  there, I would've said fine, bring me the evidence and
5  I'd be all right with it. He never did say anything
6  like that. All he said was that he blocked off right
7  there.
8  Q  You pointed all that out and we've talked
9  about it.
10 A  That was it. That's all he said.
11 Q  Okay.
12 A  I thought that maybe you all were worried
13 about me claiming that part of that easement where I
14 put my front tire at.
15 Q  No, sir. Do you have any idea of where the
16 parking was going to be extended on Irving Street that
17 you talked about?
18 A  That's going to be hard to do. You don't have
19 the other side of Irving. It goes down the center line
20 of Irving Street.
21 Q  Parking?
22 A  Parking underneath.

Page 75

1  Q  Oh, underneath.
2  A  Underground parking. The county wants to
3  extend out to allow as much parking as possible in
4  Clarendon.
5  Q  So that's independent of any easement on the
6  right-of-way, on the driveway.
7  A  It affects the driveway because they have to
8  tear up the land to build it. Do you understand? The
9  driveway doesn't stay there if you're going to put
10 parking underneath.
11 Q  Did Don Williams tell you that in that manner?
12 MS. SHANNON: No. Did you tell Don that is
13 was going to be torn up?
14 Q  Oh. Thank you. Did you tell Don that it was
15 going to be torn up?
16 A  Yes. I told me that they're asking me to
17 extend parking out onto Irving Street from this. "Are
18 there any objections, Don?" He said, "No. It's your
19 property. Do as you damn well please." That was his
20 term, as you damn well please. That told me there was
21 no easement.
22 Q  That's how you interpreted it.

Page 76

1  A  That's the way I interpreted it.
2  MR. CUMMINGS: All right. Thank you, sir.
3  He's going to have a few questions.
4  EXAMINATION BY COUNSEL FOR DEFENDANT
5  BY MR. RINALDI:
6  Q  Mr. Strother, my name is John Rinaldi. I'm
7  the attorney for ZOM Clarendon, L.P., the current owner
8  of your former property.
9  A  Yes, sir.
10 Q  We have exhibit one in front of us. Let's go
11 back a little bit through some of your testimony. Can
12 you tell me a little bit about your dad's level of
13 education?
14 A  My father's education? Let's see. He
15 graduated from law school from what I understand, but
16 he never practiced law. He went into the service
17 shortly thereafter graduation. When he got out, he
18 went back to the post office where he had a job before
19 he went into the service during World War II.
20 Q  Okay. Have you seen your father's law degree?
21 A  No, I haven't.
22 Q  Before, your testimony was that you bought the

Page 77

1  property around 1979; is that correct?
2  A  I think that is correct, yes.
3  Q  Before 1979, did you ever see the property?
4  A  No. I never had a reason to be up there.
5  Q  Okay. In 1979, is that when you started
6  working at the print shop?
7  A  No. I start working in the print shop in 1970
8  when we were over on Highland Street.
9  Q  Let me clarify my question. In 1979, you and
10 your father moved the print shop from Highland Street
11 over to their Irving Street location.
12 A  Correct.
13 Q  Did you work there everyday?
14 A  Everyday, six days a week.
15 Q  What hours did you have?
16 A  Basically from about 8:30 in the morning until
17 about 4:30 when my father was healthy. I did a couple
18 of hours in the evening.
19 Q  And that was from 1979 until when?
20 A  2002.
21 Q  During your deposition, Mr. Cummings
22 characterized your work as constantly looking down at

Capital Reporting Company
J. Strother

21 (Pages 78 to 81)

Page 78

print work. Is it possible that you would go outside from time-to-time during your work?
A  From time-to-time I would do deliveries?
Q  Are you a smoker?
A  I am a smoker.
Q  Would you go outside from time-to-time to take smoke breaks?
A  Yes, I would, but not when my father was there.
Q  Okay.
A  My father hated my smoking so therefore, I respected him and avoided him and I did.
Q  Where would you generally park when you came to work?
A  I'd park right behind the Reamy building or whatever you call it.
Q  Could you make a little square on exhibit one where you would normally park?
A  (Witness complies.)
Q  And that was everyday that you worked?
A  Everyday and evening too.
Q  Did Mr. Lee ever or anyone representing the

Page 79

Lee family ever come and ask you to move your car?
A  Never. The only time they ever asked was when Don was having problems with his Suburban overhanging the sidewalk. They asked if I could pull back a little bit to give him a little bit more room to get his truck off the sidewalk.
Q  Would he park on the southwest side of the Reamy building or on the north east side of the Reamy building?
A  Uh --
Q  Why don't you put an X on the paper where he generally would park?
A  Right there.
Q  Is it safe to say it was before the fence was put in place, if you pulled your car too far back onto the Lee property --
A  It would block them from being able to get two cars in.
Q  So they didn't ask you to move so that they could get access to their property, did they?
A  No, not from off my driveway if that's what you're asking.

Page 80

Q  Yeah. Did they ask you to move off the driveway?
A  Three times in my time there, Don had come to ask for -- he needed to repair the little closet on the second floor that looked out on our back side. He had to repair it once. He had to paint it once, and the side, which is this side here, the north side, I guess, of the Reamy building, he needed to paint that wall white, so he needed the people to be able to put the ladders up.
Q  Okay.
A  He asked us permission to be able to put the ladders up to paint that wall.
Q  He didn't say we're going here because we --
A  No. He asked us if we would allow him to do it.
Q  So he asked you permission all three of those times.
A  All three of those times.
Q  Were there any other times that they would ask you to move out of the easement area?
A  None. I parked my car there when I went on

Page 81

vacations. I parked my car there when I went into D.C. to the bars or whatever. Whenever I needed to ride the Metro, I parked my car there.
Q  When you say you parked there on vacations, how long would that be for?
A  Two weeks at a time.
Q  At any of those times, did the Lees ask you to move your car?
A  Never. The fire department always asked us to leave a key with somebody in case they needed to get in there with a fire truck. I can't see a fire truck going down a 14-feet thing, but to please the fire department, the American Shoe Repair had a key to my vehicle anytime that I left it there. They were a tenant of ours and the fire department knew it.
Q  During the time from 1979 until 2006 when you owned the property, did you ever observe any member of the Lee family driving a car up your driveway?
A  Never.
Q  Did you ever observe any member of the Lee family or any other tenants or anyone else using your driveway for access to the back of their property?

Capital Reporting Company
J. Strother

25 (Pages 94 to 97)

Page 94

1  and then I think I'll be done. I think I'm going more
2  quickly than I previously thought.
3     A  Please. This shows my building as white. I
4  painted it yellow after I took over.
5     Q  Okay. From the time you first observed the
6  property when you first moved into your building, tell
7  me about tenants in the Reamy building. Other than the
8  one tenant you just spoke about, was it ever occupied
9  otherwise?
10    A  The second floor was lived in by Mr. Lee's
11 father, I guess. I always knew him as Grandfather Lee.
12    Q  Okay.
13    A  He was there -- well, he wasn't there; his
14 widow was there, briefly, when we first bought. Mr.
15 Lee, the old man who had lived there on the second
16 floor had fallen off the roof when his ladder slipped
17 and he broke, from what I heard, several ribs and died.
18    Q  Was that the father or the grandfather?
19    A  Grandfather.
20    Q  Okay.
21    A  That's what I heard. I never knew the man. A
22 year or so later, they kind of gutted the place. They

Page 95

1  stripped it out. I don't know what they did. They
2  probably grandma home with them. I have no idea. It
3  became empty. From that day on, there was never any
4  tenants except for Don used the first floor for storage
5  for their little Sam's Market, whatever that is.
6     Q  Okay.
7     A  At one time, I think they tried to have
8  somebody on the first floor that ran antique shop, but
9  those people didn't know what the heck they were doing.
10    Q  Okay. I just want to get one fact clear. In
11 the entire time you owned the property, the Lees never
12 asked you to move out of the driveway area because they
13 needed access to their property.
14    A  For whatever reason, no.
15    Q  And they never said to you, we've got a right
16 of access across here; please stop blocking it.
17    A  Never. Never. That is one thing for sure,
18 they have never, ever asked or stated that.
19    Q  And it's also your testimony that from 1979 to
20 2006 when you owned the property that --
21       MR. CUMMINGS: Well, his father owned the
22 property.

Page 96

1     Q  I mean, when your father owned the property --
2     A  I owned half of it at this time too.
3     Q  That when you or your father owned the
4  property, your personal observation was that you never
5  saw any member of the Lee family or any of their
6  tenants use this area for access to the Lee property,
7  correct?
8     A  That's correct.
9     Q  Other than your testimony of the three times
10 you've already testified about where they asked your
11 permission to use the area, you never saw them use it
12 for access to the back door of the Reamy property.
13    A  No, never.
14       MR. RINALDI: Okay. I have no other questions.
15       MR. CUMMINGS: All right. Let's take a brief
16 break.
17       (Whereupon, a brief recess was taken.)
18       EXAMINATION BY COUNSEL FOR PLAINTIFF
19 BY MR. CUMMINGS:
20    Q  I have a few follow-up questions, and one is
21 about smoking. I believe your testimony was that from
22 '79 to '99 when your father died that you would not

Page 97

1  take a smoke break.
2     A  I would not smoke in front of him. That's
3  what I stated. I would take a smoke break when I went
4  out and did deliveries.
5     Q  How often did you do deliveries?
6     A  You mean daily or weekly?
7     Q  Break it down however you want.
8     A  Probably twice a day.
9     Q  I believe you mentioned earlier that some of
10 your customers were on Capitol Hill.
11    A  Yeah.
12    Q  So were some of your deliveries in the
13 Virginia Metropolitan area or did they go beyond that?
14    A  It was just Washington, D.C. and Washington
15 airport, Alexandria.
16    Q  So they could take anywhere from a half-hour
17 to an hour.
18    A  To an hour, yes.
19    Q  Did we ever figure out how many deliveries a
20 week on average you did?
21    A  I don't know. I would guess about 15. I
22 mean, it depends on before I got the camera, I would

Page 98

1  have to go over to IBS to have film made or positives
2  made, depending on how I needed to do the job. They
3  were only a few blocks away. I dealt with Elrods, who
4  was out in Fairfax. They did the same thing before I
5  got my own camera. I had to go out and get provisions
6  done; all work-related.
7     Q  Your estimate is about 15 a week.
8     A  Yeah.
9     Q  Anywhere from a half-hour to an hour.
10    A  Yeah.
11    Q  You mentioned you left for lunch. Did you go
12 home for lunch?
13    A  I mentioned if I decided to go home for lunch.
14 Most of the time I brought my lunch in and worked
15 through the lunch period. It was a two man slave shop
16 -- sweat shop. Excuse me. We worked to get the jobs
17 out and then we took our breaks or ate while we did the
18 work.
19    Q  You answered a series of questions from Mr.
20 Rinaldi. You identified your truck.
21    A  Yes, that's my truck.
22    Q  Your red F-10 truck there.

Page 99

1     A  Right.
2     Q  If the fence wasn't there, is there enough
3  room for somebody to walk past there?
4     A  Yes. Sure.
5     Q  You also said you thought the fence was still
6  up.
7     A  I thought the fence was still up, and it still
8  looks like it's here in this photograph.
9     Q  Yeah, but didn't used to run from here to here
10 on this yellow line you put on exhibit nine?
11    A  Yeah. It used to run all the way across.
12    Q  On exhibit nine, the fence isn't there now.
13    A  Correct.
14    Q  This yellow line shows where it was put up.
15    A  Yes. It shows where I recognized where it
16 used to be.
17    Q  Now, on this same exhibit nine, was the berm
18 pictured in any of this property?
19    A  No. After the fence went in, I dug a little
20 trench right across here to drain water out of this
21 little area here that was collecting because the Lees
22 put in gravel on their parking lot that raised it up.

Page 100

1  Water would gather right here and go into his building.
2  So I dug a little trench right through here to help for
3  the water to get away from there so it wouldn't flood
4  his little building.
5     Q  So that's neighborly of you.
6     A  You do what you can for your neighbors. I was
7  always raised that way.
8     Q  Now this photograph in exhibit five shows the
9  rear of the property without the fence. That looks
10 like a Chevy Suburban there.
11    A  Yes.
12    Q  Is there still room for somebody to walk past
13 there?
14    A  I would say so. I guess. I don't know. It's
15 hard to tell from that photograph. Without me parked
16 there, yeah somebody could walk through there, I guess.
17    Q  It's not a trick question.
18    A  I don't know.
19       MR. CUMMINGS: I think we've squeezed
20 everything out of him we could.
21       EXAMINATION BY COUNSEL FOR DEFENDANT
22 BY MR. RINALDI:

Page 101

1     Q  You testified that a person could walk through
2  there.
3     A  Without the fence.
4     Q  Did you actually observe anybody ever actually
5  walk through there?
6     A  Oh, yes. Don used to walk through there all
7  the time.
8     Q  Tell me what you mean by that.
9     A  He used to walk through this parking lot.
10    Q  This parking lot, you mean the Lees parking
11 lot.
12    A  The Lees parking lot where they parked six or
13 seven cars at.
14    Q  Okay.
15    A  He used to walk from there to the back side of
16 the building there.
17    Q  To the back of the Reamy building.
18    A  Right.
19    Q  But he could do that and stay on the Reamy
20 property, could he not?
21    A  Correct.
22    Q  So he didn't have to go through your property