## Capital Reporting Company
## J. Strother

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VIRGINIA

------------------------x

SUN YUNG LEE,                    :

      Plaintiff,          :

vs.                              : Case No.: 1:09 CV402

ZOM CLARENDON, L.P.,             :

      Defendant.          :

------------------------x

                  Arlington, Virginia

                Friday, July 10, 2009

Deposition of:

                   JOHN STROTHER

    called for examination by counsel for Plaintiff,

pursuant to notice, at Sher, Cummings & Ellis, 3800

North Fairfax Drive, Suite 7, Arlington, Virginia,

before Gervel A. Watts, of Capital Reporting Company, a

Notary Public in and for the Commonwealth of Virginia,

beginning at 10:10 a.m., when were present on behalf of

the respective parties:

EXHIBIT

A

**Capital Reporting Company**
**J. Strother**

Page 22

1    A   Correct.

2    Q   Is there a door back there?

3    A   Oh, yes.  There is a garage door plus a

4  regular office door and then there is a walkway that

5  goes back to the backside of Madhuban Restaurant and

6  American Shoe Repair.  So there are several doors on

7  the backside.

8    Q   Okay.  Let's mark this as Strother 3.

9         (Strother Exhibit Number 3 was

10        marked for identification.)

11    Q   I think this photograph was taken either in

12  the late 90s or the early 2000s.  I'd ask you if you

13  recognize that photograph.

14    A   I recognize it.  The car that is sitting there

15  would be my father's Oldsmobile that I got after he

16  passed away.

17    Q   The black car there?

18    A   Well, it's actually a dark blue.

19    Q   There's a garage door back here.

20    A   The garage door is right there.

21    Q   Put an X where that garage door is.

22    A   Let me put a line first to indicate about

## Capital Reporting Company
## J. Strother

1    reserve on exhibit two, but that's also part of the

2    deposition record.

3              MR. RINALDI:  Okay.

4              MR. CUMMINGS:  Let's take a little break and

5    we'll resume in a few minutes.

6              (Whereupon, a brief recess was taken.)

7    BY MR. CUMMINGS:

8         Q    Let me just ask you some general questions

9    about when you worked there.  Generally, what were your

10   hours?

11        A    Well, my father got in usually about 7:00 a.m.

12   He was an early bird.  I usually showed up by 8:30.  My

13   father would leave somewhere around 2:00/3:00, being an

14   elderly man that he was, he'd go home.  He was retired

15   as the Postmaster of Arlington, he was entitled to.  I

16   stayed until about 4:30/5:00 sometimes.  When he was

17   ailing, I was there until 7:00 or 8:00 at night.  Many

18   times I would come back in and work a couple of hours

19   from 10:00 to midnight when it was most quiet in there

20   to do work for preparing for the next day.

21        Q    Okay.  And that's pretty labor intensive work

22   doing this silk-screening.

**Capital Reporting Company**
**J. Strother**

Page 42

1      A    That's the back door to Madhuban.  Where it

2    says eight foot, is the back door to the American Shoe

3    Repair.

4      Q    Oh, I see.  So there are two rear doors here.

5    So that gave them access to this area back here.

6      A    Correct, which also gave them a fire exit.  In

7    case of a fire, patrons could exit through the back,

8    which is a standard fire department regulation.

9      Q    Okay.

10      A    The fence kind of crowded that, but the fire

11   marshal didn't --

12             (Strother Exhibit Number 5 was

13             marked for identification.)

14      Q    Let's take a look at another one of these.

15   I'm going to show you an overhead photograph that's

16   marked as exhibit five.  Again, I don't know the year

17   of this one.  You might be able to tell from the cars.

18             MS. SHANNON:  2007.  I mean, it says it on the

19   top front.  That's from Arlington County.

20      Q    It says 2007.  The cars look fairly new.

21   Anyway, I going to ask you if this corresponds with the

22   earlier photograph that you were looking at, Strother

## Capital Reporting Company
### J. Strother

Page 46

1    Suburban, but I do not know.

2              MR. CUMMINGS:  Why don't you ask a leading

3    question?

4              MR. RINALDI:  I just asked him if recognized

5    the car.

6              THE WITNESS:  I don't recognize it.  It looks

7    like Don's Suburban, but I can't tell.  He drove a

8    great big dark blue Suburban.

9    BY MR. RINALDI:

10       Q    Based on your knowledge of the property lines

11   and the meets and bounds of this claimed easement, in

12   your estimation, is that truck parked in the easement,

13   blocking the easement?

14       A    Yes.

15       Q    Okay.

16       A    If there was an easement.  I'm not sure there

17   ever was an easement.  The only way I knew that there

18   was an easement was after I sold, Don came up and told

19   me, "I blocked the easement with that fence."  That was

20   the first time I ever heard about it.

21             EXAMINATION BY COUNSEL FOR PLAINTIFF

22   BY MR. CUMMINGS:

**Capital Reporting Company**
**J. Strother**

Page 49

1    get along the best he could.

2         Q    All right.  Thank you, Mr. Strother.  Mr.

3    Strother, did you have an occasion to meet Mr. Rinaldi

4    before today?

5         A    I met Mr. Rinaldi about ten days ago, I think.

6         Q    Can you tell me the circumstances?

7         A    I came to his office to discuss a little bit

8    about this property.

9         Q    What did you discuss?

10        A    Basically, if I felt that there had been an

11   easement to Mr. Lee or the Lee family.  In my opinion,

12   they never had one.

13        Q    What is your opinion based on?

14        A    Thirty years of being there.

15        Q    Other than the fence, has there been anything

16   that has blocked the driveway?

17        A    At one time I talked to Mr. Lee and put in a

18   small earthen cinderblock post at the front end of my

19   car.  He was concerned about people pulling through our

20   driveway into the backside and blocking his dumpsters.

21   So he agreed with me that we put this little barrier in

22   to keep people from driving through.

**Capital Reporting Company**
**J. Strother**

Page 70

1    what you're talking about.

2              MR. RINALDI:  He still hasn't asked you a

3    question.

4        Q    When you say you can see what I'm talking

5    about --

6        A    I can see the outline --

7              MR. RINALDI:  Objection.  There's no question

8    pending before you.

9        Q    What do you see in this survey?

10             MR. RINALDI:  Objection, no foundation.  You

11   have to ask him if he recognizes the document or if

12   he's ever seen it before.

13             MR. CUMMINGS: I'm not going to do it your way.

14   I'm going to do it my way.

15             MR. RINALDI:  Okay.

16   BY MR. CUMMINGS:

17       Q    Does the document refer to Lots 238, 239, 240,

18   and part of 241 and 217?

19             MR. RINALDI:  Your way is subject to a

20   standing objection that there's no foundation because

21   he hasn't said he's ever seen the document before.

22       Q    Okay.  Dated July 30, 1935, have you ever seen

## Capital Reporting Company
### J. Strother

1    this document before?  I'll do it your way.

2         A   Never.  In my opinion, I've never seen it.

3         Q   Does this document purport to be the corner of

4    Irving and Washington --

5              MR. RINALDI:  Objection.  Subject to my

6    objection, his answer is that he's never seen the

7    document before.

8              MR. CUMMINGS: All right.  Thank you for making

9    your record.

10             THE WITNESS:  I couldn't swear to it.  It

11   indicates that it is, but I can't swear to it.

12   BY MR. CUMMINGS:

13        Q   Okay, good.  But you've never seen this, have

14   you?

15        A   Not to my knowledge.

16        Q   So if this document is valid deed and refers

17   to --

18             MR. RINALDI:  Objection, calling for

19   speculation of the witness.

20             MR. CUMMINGS:  He's been speculating all

21   morning.

22             MR. RINALDI:  I'm going to object to that.

**Capital Reporting Company**
**J. Strother**

Page 77

1    property around 1979; is that correct?

2         A    I think that is correct, yes.

3         Q    Before 1979, did you ever see the property?

4         A    No.  I never had a reason to be up there.

5         Q    Okay.  In 1979, is that when you started

6    working at the print shop?

7         A    No. I start working in the print shop in 1970

8    when we were over on Highland Street.

9         Q    Let me clarify my question.  In 1979, you and

10   your father moved the print shop from Highland Street

11   over to their Irving Street location.

12        A    Correct.

13        Q    Did you work there everyday?

14        A    Everyday, six days a week.

15        Q    What hours did you have?

16        A    Basically from about 8:30 in the morning until

17   about 4:30 when my father was healthy.  I did a couple

18   of hours in the evening.

19        Q    And that was from 1979 until when?

20        A    2002.

21        Q    During your deposition, Mr. Cummings

22   characterized your work as constantly looking down at

## Capital Reporting Company
### J. Strother

Page 80

1        Q    Yeah.   Did they ask you to move off the

2    driveway?

3        A    Three times in my time there, Don had come to

4    ask for -- he needed to repair the little closet on the

5    second floor that looked out on our back side.  He had

6    to repair it once.  He had to paint it once, and the

7    side, which is this side here, the north side, I guess,

8    of the Reamy building, he needed to paint that wall

9    white, so he needed the people to be able to put the

10   ladders up.

11       Q    Okay.

12       A    He asked us permission to be able to put the

13   ladders up to paint that wall.

14       Q    He didn't say we're going here because we --

15       A    No.  He asked us if we would allow him to do

16   it.

17       Q    So he asked you permission all three of those

18   times.

19       A    All three of those times.

20       Q    Were there any other times that they would ask

21   you to move out of the easement area?

22       A    None.  I parked my car there when I went on

## Capital Reporting Company
## J. Strother

Page 82

```
1        A    Never.

2        Q    One of the things that the Lees are alleging

3   is that they used your driveway, we'll call it, for

4   access to the two doors on the back of the Reamy

5   property.  Did you ever observe them doing that?

6        A    I saw Don do it one time.  He was going to

7   unlock his back door to walk through the building.  I

8   pulled up, you know, and I said why don't you just go

9   ahead and walk the driveway.  You don't have to go

10  through the trouble of unlocking your doors and stuff;

11  we're neighbors.

12       Q    Okay.  So that was with your permission then.

13       A    Yes.  Now, that was after the fence was put

14  up.  Before the fence was put up, they always came this

15  way.

16       Q    Could you draw an arrow in the direction you

17  said this way?

18       A    (Witness complies.)

19       Q    Okay.  Did --

20       A    They always came from the parking lot area,

21  which I call it, because it had an apron at the parking

22  lot area.  When the steel building was there, I had no
```

**Capital Reporting Company**
**J. Strother**

Page 87

1      Q    Did anybody from the Lee family, in your

2    direct knowledge, ever do any work along the side of

3    the easement?

4      A    Never.

5      Q    Other than painting the side of the house.

6      A    Other than painting the side of that two-story

7    building and that little deck on the back, the Lee

8    family did nothing.

9      Q    This fence here, did you ever observe anyone,

10   whether from the Lee family or otherwise, remove the

11   section of that fence to get access through to the back

12   of their property?

13     A    Not while I owned it.

14     Q    Tell me a little bit about parking in the Lees

15   parking lot, which is to the south of the Reamy

16   building.  Would they generally park there?

17     A    They parked there all the time.

18     Q    Would they generally pull their cars up in

19   such a way that it would block any access from your

20   driveway to their property?

21     A    Uh --

22     Q    Is that an unclear question?

**Capital Reporting Company**
**J. Strother**

Page 88

1       A    That's an unclear question to me because I

2    never really knew where the property lines were and to

3    be blocking my property, I would say no.

4       Q    But blocking access to the back of the Lee

5    property from your driveway.

6       A    Oh, yes.  They would definitely be blocking

7    any type of way to get through there.

8       Q    Let's mark this as an exhibit.  This would be

9    nine.

10              (Strother Exhibit Number 9 was

11              marked for identification.)

12       A    I can tell you about how far up that Don used

13    to pull that Suburban.  He pulled it up until the

14    bumper of the car pushed in the fence.

15       Q    Pushed in the fence on the --

16       A    The chain-link fence that Lee and him put up.

17       Q    Let's hold this exhibit nine in abeyance for a

18    second.  Can I see exhibit three?  Could you put a

19    small mark, maybe with a yellow highlighter, as to

20    where he would bump up against the fence?

21       A    Right here.  It's right there.  That truck

22    right there is where you have the fence in.  You can

## Capital Reporting Company
### J. Strother

Page 89

1   see it right there.

2        Q    This is exhibit nine.  Do you recognize that?

3        A    This looks like, looks like now --

4        Q    Right.

5        A    I can't swear to it, but this looks like

6   almost standing at my front door, looking over into the

7   Lees' property with the two-story building on the left-

8   hand side.  That's what it looks like.

9        Q    So it looks to you as though if you stepped

10  out of your front door and looked to the right, that's

11  what you would see.

12       A    Correct.

13       Q    Okay.

14       A    Except the fence would be there.

15       Q    Draw a yellow line where the fence normally

16  was.

17       A    (Witness complies.)

18       Q    In the years that you occupied the property,

19  does this accurately reflect where the Lees generally

20  allow their tenants to park or themselves park?

21       A    Correct.

22       Q    I'm going to show you another exhibit that

**Capital Reporting Company**
**J. Strother**

Page 90

1    we'll mark as exhibit ten.

2              (Strother Exhibit Number 10 was

3              marked for identification.)

4        A    You know, honestly, the whole thing is, I

5    thought that I was being accused of something wrong

6    when I responded.

7        Q    I don't have a question for you.  Do you

8    recognize this exhibit ten?  What does this appear to

9    be to you?

10       A    It appears to be an aerial photograph, showing

11   the whole corner of the Lees, myself and Midas Muffler

12   and the Fadoul's property and the rest of the

13   neighborhood on that corner.

14       Q    Tell me something; there appears to be a

15   vehicle parked on your driveway.  Do you recognize that

16   vehicle?

17       A    Oh, yes.  That's my Chevy F-10 pick up.

18       Q    How often would you park your Chevy F-10 pick

19   up there?

20       A    Six days, seven days a week, 12 hours a day,

21   except for deliveries and when I went home to eat lunch

22   or go over and see my honey.







**ALTA/ACSM LAND TITLE SURVEY**

LOTS 206, 207, 208, 209, 210, 211, 212, 213, 214, 215 & 216
AND PART OF LOTS 217, 241, 242, 243, 244, 245, 246 & 247

# CLARENDON

(DEED BOOK 102, PAGE 138)

# ARLINGTON COUNTY, VIRGINIA

SCALE: 1" = 20'        DATE: SEPTEMBER 8, 2006

**GRAPHIC SCALE**

( IN FEET )
1 inch =  20  ft.

| REVISION | |
|---|---|
| 11-30-08 | REVISED |
| 13-1-08 | REVISED |

# Bowman
## CONSULTING

Bowman Consulting Group, Ltd
2121 Eisenhower Avenue, Suite 303
Alexandria, Virginia 22314

Phone (703) 549-7198
Fax (703) 683-5761
www.bowmanconsulting.com

© Bowman Consulting Group Ltd

DWG.P: \3532 — Clarendon\3532-01-002 (SUR)\Survey\Plats\3532-03-001-ALTA-ZON.dwg

| BCG PROJECT NO: 3632-03-001 | DSGN1 | BY: AJB | CHK: DZ | SHEET 2 OF 2 |



## SYMBOLS

- ⌀ UTILITY POLE
- ○ LIGHT POLE
- ⬦ FIRE HYDRANT
- ◎ PARKING METER
- ⬠ GUY WIRE
- ● BOLLARD
- ■ TRAFFIC POLE
- OHE OVERHEAD WIRES

- ⊙ STORM MANHOLE
- ⊛ SANITARY MANHOLE
- ⊕ TELEPHONE MANHOLE
- ⊗ WATER MANHOLE
- ⊠ WATER VALVE
- ⊙ WATER METER
- ⊠ GAS VALVE
- ⊖ GAS METER

## LEGEND

| | | | |
|---|---|---|---|
| BRL | BUILDING RESTRICTION LINE | COR | CORNER |
| BSMT. | BASEMENT | S/W | SIDEWALK |
| CB | CATCH BASIN | PROP | PROPERTY |
| C&G | CURB & GUTTER | STY. | STORY |
| CONC. | CONCRETE | IPS | IRON PIPE SET |
| DB | DEED BOOK | DHS | DRILL HOLE SET |
| PG | PAGE | NS | NAIL SET |
| BLDG | BUILDING | POB | POINT OF BEGINNING |

## SURVEYOR'S CERTIFICATE

TO ZOM MID-ATLANTIC, INC., ZOM CLARENDON, L.P., ZOM, INC., BFV INTERIM FINANCE, B.V., FIRST AMERICAN TITLE INSURANCE COMPANY AND REGIONAL TITLE INC.:

THIS IS TO CERTIFY THAT THIS MAP OR PLAT AND THE SURVEY ON WHICH IT IS BASED WERE MADE IN ACCORDANCE WITH "MINIMUM STANDARD DETAIL REQUIREMENTS FOR ALTA/ACSM LAND TITLE SURVEYS", JOINTLY ESTABLISHED AND ADOPTED BY ALTA AND NSPS IN 2005, AND INCLUDES ITEMS 2, 3, 4, 6, 7(a), 8, 9, 10, 11(a), 13 AND 14 OF TABLE A THEREOF.   PURSUANT TO THE ACCURACY STANDARDS AS ADOPTED BY ALTA AND NSPS AND IN EFFECT ON THE DATE OF THIS CERTIFICATION, UNDERSIGNED FURTHER CERTIFIES THAT IN MY PROFESSIONAL OPINION, AS A LAND SURVEYOR LICENSED IN THE COMMONWEALTH OF VIRGINIA, THE RELATIVE POSITIONAL ACCURACY OF THIS SURVEY DOES NOT EXCEED THAT WHICH IS SPECIFIED THEREIN.



DONALD J. ZDANCEWICZ
REGISTRATION NO. 2197

## OWNER

FAISON-CLARENDON LLC
121 WEST TRADE STREET
27TH FLOOR
CHARLOTTE, NC 28202
DEED BOOK 3944, PAGE 2546
DEED BOOK 3945, PAGE 579
DEED BOOK 3945, PGE 2115
DEED BOOK 3948, PAGE 1427

## GENERAL NOTES

1. THE PROPERTY DELINEATED HEREON IS SHOWN ON ARLINGTON COUNTY TAX ASSESSMENT MAP 53-3, REAL PROPERTY CODE (RPC) 15078003, 15078004, 15078005, 15078013, 15078014, 15078015, 15078016, 15078017, 15078018 & 15078023 AND IS ZONED C-3.

2. TITLE REPORT FURNISHED BY FIRST AMERICAN TITLE INSURANCE COMPANY, COMMITMENT NUMBER 08501, EFFECTIVE DATE OF NOVEMBER 13, 2008.

3. THIS PROPERTY IS LOCATED IN FLOOD ZONE "C", AN AREA OUTSIDE THE 500 YEAR FLOOD PLAIN, AS SHOWN ON THE FLOOD INSURANCE RATE MAP OF ARLINGTON COUNTY PREPARED BY THE FEDERAL EMERGENCY MANAGEMENT AGENCY, COMMUNITY PANEL NUMBER 545520_0010 B, MAP REVISED MAY 3, 1982.

4. THERE IS NO VISIBLE EVIDENCE OF CEMETERIES OR BURIAL GROUNDS ON THIS PROPERTY.

5. THERE ARE A TOTAL OF 11 DELINEATED PARKING SPACES ON THIS PROPERTY, WITH NONE BEING DESIGNATED FOR HANDICAP PARKING.

## METES & BOUNDS DESCRIPTION — COMPOSITE

LOTS 206 THROUGH 216, ALL INCLUSIVE, AND PART OF LOTS 217, 241, 242, 243, 244, 245, 246 AND 247, CLARENDON, AS THE SAME APPEARS DULY DEDICATED, PLATTED AND RECORDED IN DEED BOOK 162 AT PAGE 138 AMONG THE LAND RECORDS OF ARLINGTON COUNTY, VIRGINIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE POINT OF INTERSECTION OF THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF 13TH STREET NORTH, VARIABLE WIDTH RIGHT-OF-WAY, WITH THE SOUTHWESTERLY RIGHT-OF-WAY OF NORTH IRVING STREET, VARIABLE WIDTH RIGHT-OF-WAY, AND RUNNING THENCE WITH THE SOUTHWESTERLY RIGHT-OF-WAY LINE OF NORTH IRVING STREET, S 38°44'00" E 314.00 FEET TO A POINT, SAID POINT BEING A CORNER COMMON TO PART OF LOT 217, CLARENDON; THENCE DEPARTING THE SOUTHWESTERLY RIGHT-OF-WAY LINE OF NORTH IRVING STREET AND RUNNING WITH THE LINE COMMON TO SAID PART OF LOT 217, S 51°16'00" W 35.50 FEET TO A CORNER COMMON TO SAID PART OF LOT 217; THENCE RUNNING WITH THE LINE COMMON TO SAID PART OF LOT 217, S 38°44'00" E 12.00 FEET TO A POINT, SAID POINT BEING IN THE LINE COMMON TO PART OF LOT 241, CLARENDON; THENCE RUNNING WITH THE LINE COMMON TO SAID PART OF LOT 241, S 00°07'21" E 107.93 FEET TO A POINT ON THE NORTHERLY RIGHT-OF-WAY LINE OF WASHINGTON BOULEVARD, VARIABLE WIDTH, SAID POINT BEING A CORNER COMMON TO SAID PART OF LOT 241; THENCE RUNNING WITH THE NORTHERLY RIGHT-OF-WAY LINE OF WASHINGTON BOULEVARD, N 89°04'30" W 157.50 FEET TO A POINT, SAID POINT BEING A CORNER COMMON TO PART OF LOT 248, CLARENDON; THENCE DEPARTING THE NORTHERLY RIGHT-OF-WAY LINE OF WASHINGTON BOULEVARD AND RUNNING WITH THE LINE COMMON TO SAID PART OF LOT 248, N 00°30'30" W 112.00 FEET TO A POINT IN THE LINE OF LOT 218, SAID POINT BEING A CORNER COMMON TO SAID LOT 248, S 89°04'30" E 51.71 FEET TO A POINT, SAID POINT BEING A CORNER COMMON TO SAID LOT 218; THENCE RUNNING WITH THE LINE COMMON TO SAID PART OF LOT 218 AND CONTINUING WITH THE LINE COMMON TO LOTS 219, 220, 221, 222, 223 AND PART OF LOT 224, CLARENDON, N 38°44'00" W 254.83 FEET TO A POINT ON THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF 13TH STREET NORTH, SAID POINT BEING A CORNER COMMON TO SAID PART OF LOT 224; AND THENCE RUNNING WITH THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF 13TH STREET NORTH, N 51°16'00" E 115.00 FEET TO THE POINT OF BEGINNING, CONTAINING 51,696 SQUARE FEET OR 1.18678 ACRES.

## ZONING CODE BULK REGULATIONS

HEIGHT LIMIT:
NO BUILDING, NOR THE ENLARGEMENT OF ANY BUILDING, SHALL BE HEREAFTER ERECTED TO EXCEED SEVENTY-FIVE (75 FEET, EXCEPT BY SITE PLAN AS PROVIDED IN SUBSECTION D OF SECTION 27.

FLOOR AREA REQUIREMENTS:
THE FLOOR AREA IN THIS DISTRICT SHALL NOT EXCEED THE NUMBER OF SQUARE FEET THAT RESULTS FROM COMPLIANCE WITH THE REQUIREMENTS STATED IN THE ORDINANCE WITH NO LESS THAN NINE (9) FEET BETWEEN FLOORS, EXCEPT BY SITE PLAN AS PROVIDED IN SUBSECTION D OF SECTION 27.

SETBACKS:
NO STRUCTURE SHALL BE LOCATED CLOSER TO THE CENTERLINE OF ANY STREET OR OFFICIALLY DESIGNATED STREET RIGHT-OF-WAY THAN FIFTY (50) PERCENT OF THE HEIGHT OF THE BUILDING. FOR ALL "C" AND "M" DISTRICTS EXCEPTING "C-1", "C-1-0", "C-0", "C-M" AND "C-S-C": FORTY (40) FEET FROM SAID CENTERLINE.

SIDE AND REAR YARDS:
FOR ALL "R.M.F.", "C" AND "M" DISTRICTS, NOT INCLUDING "C-1-0": NO SIDE OR REAR YARD SHALL BE REQUIRED EXCEPT THAT NO WALL EITHER ON THE SIDE OR REAR OF A LOT ABUTTING AN "R" OR "RA" DISTRICT OR CONTAINING OPENINGS OR WINDOWS, WHETHER OR NOT THEY CAN BE OPENED, SHALL BE LOCATED CLOSER TO SIDE OR REAR LOT LINES THAN EIGHT (8) FEET FOR THE FIRST TEN (10) FEET OF BUILDING HEIGHT, PLUS TWO (2) ADDITIONAL FEET FOR EACH TEN (10) ADDITIONAL FEET OF BUILDING HEIGHT, OR FRACTION THEREOF.

## METES & BOUNDS DESCRIPTION – PARCEL I

PART OF LOTS 242–247, BLOCK 6, PLAN FOR CLARENDON FOR WOOD HARMON REAL ESTATE ASSOCIATION, AS THE SAME APPEARS DULY DEDICATED, PLATTED AND RECORDED IN DEED BOOK 102 AT PAGE 138, AMONG THE LAND RECORDS OF ARLINGTON COUNTY, VIRGINIA, AND AS IS MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS SET FORTH BELOW:

BEGINNING AT A POINT LOCATED ON THE NORTHERLY RIGHT–OF–WAY LINE OF WASHINGTON BOULEVARD, VARIABLE WIDTH RIGHT–OF–WAY, SAID POINT BEING A CORNER COMMON TO PART OF LOT 243, CLARENDON, THENCE RUNNING WITH SAID NORTHERLY RIGHT–OF–WAY LINE OF WASHINGTON BOULEVARD, N50°54'30"W 125.00 FEET TO A POINT, SAID POINT BEING A CORNER COMMON TO PART OF LOT 248, CLARENDON; THENCE DEPARTING THE NORTHERLY RIGHT–OF–WAY LINE OF SAID WASHINGTON BOULEVARD AND RUNNING WITH THE LINE COMMON TO SAID PART OF LOT 242, N00°30'30"W 112.00 FEET TO A POINT IN THE LINE OF LOT 218, CLARENDON; SAID POINT BEING A CORNER COMMON TO PART OF LOT 247, CLARENDON; THENCE, DEPARTING SAID PART OF LOT 248 AND RUNNING WITH THE LINE COMMON TO SAID LOT 218 AND CONTINUING WITH THE LINE COMMON TO LOT 218 AND PART OF LOT 217, CLARENDON, S89°54'30"E 125.00 FEET TO A POINT; SAID POINT BEING A CORNER COMMON TO PART OF LOT 242, CLARENDON; THENCE DEPARTING SAID PART OF LOT 217 AND RUNNING S00°30'30"E 22.00 FEET TO A POINT; THENCE RUNNING THROUGH PART OF LOT 242 THE FOLLOWING THREE COURSES AND DISTANCES: S89°17'30"E 1.29 FEET TO A POINT, S00°17'44"E 35.00 FEET TO A POINT AND N89°17'30"W 1.18 FEET TO A POINT IN THE LINE OF PART OF LOT 242; THENCE RUNNING WITH THE LINE COMMON TO SAID PART OF LOT 242, S00°30'30"E 55.00 FEET TO THE POINT OF BEGINNING CONTAINING 14,038 SQUARE FEET OR 0.32227 ACRES.

## METES & BOUNDS DESCRIPTION – PARCEL II

LOTS 206 THROUGH 215, ALL INCLUSIVE, BLOCK 6, ON A PLAN OF CLARENDON FOR WOOD HARMON REAL ESTATE ASSOCIATION, AS THE SAME APPEARS DULY DEDICATED, PLATTED AND RECORDED IN DEED BOOK 102 AT PAGE 138, AMONG THE LAND RECORDS OF ARLINGTON COUNTY, VIRGINIA, AND BEING MORE PARTICULARLY DESCRIBED BY THE FOLLOWING METES AND BOUNDS AS SET FORTH BELOW.

BEGINNING AT THE POINT OF INTERSECTION OF THE SOUTHEASTERLY RIGHT–OF–WAY LINE OF 13TH STREET NORTH, VARIABLE WIDTH RIGHT–OF–WAY, WITH THE SOUTHWESTERLY RIGHT–OF–WAY OF NORTH IRVING STREET, VARIABLE WIDTH RIGHT–OF–WAY, AND RUNNING THENCE WITH THE SOUTHWESTERLY RIGHT–OF–WAY LINE OF NORTH IRVING STREET S38°44'00"E 250.00 FEET TO A POINT, SAID POINT BEING A CORNER COMMON TO LOT 216, CLARENDON; THENCE DEPARTING THE LINE COMMON TO SAID LOT 216 S53°16'00"W 115.00 FEET TO A POINT IN THE LINE OF LOT 218, CLARENDON, SAID POINT BEING A CORNER COMMON TO SAID LOT 216; THENCE RUNNING WITH THE LINE COMMON TO SAID LOT 218, AND CONTINUING WITH THE LINE COMMON TO LOTS 219, 220, 221, 222, 223 AND PART OF LOT 224, CLARENDON, N38°44'00"W 250.00 FEET TO A POINT ON THE SOUTHEASTERLY RIGHT–OF–WAY LINE OF 13TH STREET NORTH, SAID POINT BEING A CORNER COMMON TO SAID PART OF LOT 224; THENCE RUNNING WITH THE SOUTHEASTERLY RIGHT–OF–WAY LINE OF 13TH STREET NORTH, N51°16'00"E 115.00 FEET TO THE POINT OF BEGINNING, CONTAINING 28,750 SQUARE FEET, OR 0.66001 ACRES.

## METES & BOUNDS DESCRIPTION – PARCEL III

ALL OF LOT TWO HUNDRED SIXTEEN (216), AND THE NORTH TWENTY–FIVE (25) FEET BY THE FULL DEPTH OF LOT TWO HUNDRED SEVENTEEN (217), OF THE "CLARENDON SUBDIVISION" AS THE SAME APPEARS DULY PLATTED, DEDICATED AND RECORDED IN DEED BOOK 102, AT PAGE 138, ET SEQ., OF THE LAND RECORDS OF ARLINGTON COUNTY, VIRGINIA; BY "THE NORTH 25 FEET BY THE FULL DEPTH THEREOF OF LOT 217" IS MEANT THAT PART OF LOT 217 LYING BETWEEN THE SOUTHEAST BOUNDARY LINE OF LOT 218 AND A LINE DRAWN ACROSS LOT 217 AT A 25 FOOT SOUTHEAST PERPENDICULAR DISTANCE THEREFROM AND PARALLEL THERETO, WHICH PROPERTY IS NOW MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS SET FORTH BELOW:

BEGINNING AT A POINT ON THE SOUTHWESTERLY RIGHT–OF–WAY OF NORTH IRVING STREET, VARIABLE WIDTH RIGHT–OF–WAY, SAID POINT BEING A CORNER COMMON TO LOT 215, CLARENDON, AND RUNNING THENCE WITH THE SOUTHWESTERLY RIGHT–OF–WAY LINE OF NORTH IRVING STREET, S38°44'00"E 50.00 FEET TO A POINT, SAID POINT BEING A CORNER COMMON TO PART OF LOT 217, CLARENDON; THENCE DEPARTING THE SOUTHWESTERLY RIGHT–OF–WAY LINE OF NORTH IRVING STREET AND RUNNING WITH THE LINE COMMON TO SAID PART OF LOT 217, S53°16'00"W 50.00 FEET TO A POINT, SAID POINT BEING A CORNER COMMON TO SAID PART OF LOT 217 AND PART OF LOT 243, CLARENDON; THENCE RUNNING WITH THE LINE COMMON TO SAID PART OF LOT 243, AND CONTINUING WITH THE LINE COMMON TO PART OF LOT 244 AND PART OF LOT 245, CLARENDON, N38°04'30"W 70.77 FEET TO A POINT; SAID POINT BEING A CORNER COMMON TO LOT 218, CLARENDON; THENCE DEPARTING THE LINE COMMON TO SAID PART OF LOT 245, AND RUNNING WITH THE LINE OF SAID LOT 218, N38°44'00"W 4.83 FEET TO A POINT, SAID POINT BEING A CORNER COMMON TO SAID LOT 215; THENCE DEPARTING THE LINE COMMON TO SAID LOT 218 AND RUNNING WITH THE LINE OF SAID LOT 215, N51°16'00"E 115.00 FEET TO THE POINT OF BEGINNING, CONTAINING 4,520 SQUARE FEET, OR 0.10376 ACRES.

## METES & BOUNDS DESCRIPTION – PARCEL IV

ALL THOSE CERTAIN TRACTS OR PARCELS OF LAND BEING PART OF LOTS 217, 241 AND 242, OF THE SUBDIVISION OF CLARENDON, AS THE SAME APPEARS DULY DEDICATED, PLATTED AND RECORDED IN DEED BOOK 102 AT PAGE 138 AMONG THE LAND RECORDS OF ARLINGTON COUNTY, VIRGINIA, WHICH PROPERTY IS NOW MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS SET FORTH BELOW:

BEGINNING AT A POINT LOCATED ON THE SOUTHWESTERLY RIGHT–OF–WAY OF NORTH IRVING STREET, VARIABLE WIDTH RIGHT–OF–WAY, SAID POINT BEING A CORNER COMMON TO PART OF LOT 217, CLARENDON, THENCE RUNNING WITH THE SOUTHWESTERLY RIGHT OF WAY OF NORTH IRVING STREET, S38°44'00"E 14.00 FEET TO A POINT, THENCE DEPARTING THE SOUTHWESTERLY RIGHT–OF–WAY LINE OF NORTH IRVING STREET AND RUNNING ACROSS SAID PART OF LOT 217, S51°16'00"W 35.50 FEET TO A POINT AND S38°44'00"E 12.00 FEET TO A POINT; THENCE RUNNING ACROSS PART OF LOT 241, CLARENDON, S00°07'23"E 107.83 FEET TO A POINT ON THE NORTHERLY RIGHT–OF–WAY LINE OF WASHINGTON BOULEVARD, VARIABLE WIDTH RIGHT–OF–WAY; THENCE RUNNING WITH THE NORTHERLY RIGHT–OF–WAY LINE OF WASHINGTON BOULEVARD N50°54'30"W 32.50 FEET TO A POINT, SAID POINT BEING A CORNER COMMON TO PART OF LOT 243, CLARENDON; THENCE DEPARTING SAID RIGHT–OF–WAY LINE OF WASHINGTON BOULEVARD AND RUNNING WITH THE LINE COMMON TO SAID PART OF LOT 243, N00°30'30"W 55.00 FEET TO A POINT; THENCE RUNNING THROUGH PART OF LOT 242 THE FOLLOWING THREE (3) COURSES AND DISTANCES: S89°17'30"E 1.18 FEET TO A POINT, THENCE, N00°17'44"W 35.00 FEET TO A POINT, THENCE, N89°17'30"W 1.29 FEET TO A POINT IN THE LINE OF PART OF LOT 242; THENCE N00°30'30"W 22.00 FEET TO A POINT, SAID POINT BEING A CORNER COMMON TO SAID PART OF LOT 243 AND SAID PART OF LOT 217; THENCE, RUNNING N89°04'30"W 2.53 FEET TO A POINT; THENCE DEPARTING SAID PART OF LOT 243 AND RUNNING WITH THE LINE COMMON TO PART OF LOT 217, N51°16'00"E 80.52 FEET TO THE POINT OF BEGINNING, CONTAINING 4,388 SQUARE FEET, OR 0.10073 ACRES.



**SITE**

**VICINITY MAP**
NOT TO SCALE

### ALTA/ACSM LAND TITLE SURVEY

LOTS 206, 207, 208, 209, 210, 211, 212, 213, 214, 215 & 216
AND PART OF LOTS 217, 241, 242, 243, 244, 245, 246 & 247

# CLARENDON

(DEED BOOK 102, PAGE 138)

## ARLINGTON COUNTY, VIRGINIA

SCALE: 1" = 20'     DATE: SEPTEMBER 8, 2008

GRAPHIC SCALE

( IN FEET )
1 inch = 20 ft.

| REVISION | | |
|---|---|---|
| 11-30-08 | | REVISED |
| 12-1-08 | | REVISED |



**Bowman CONSULTING**

Bowman Consulting Group, Ltd.
2121 Eisenhower Avenue, Suite 302
Alexandria, Virginia 22314

Phone: (703) 548-2189
Fax (703) 683-5761
www.bowmanconsulting.com

© Bowman Consulting Group, Ltd.

| DWG.P:\3532 - Clarendon\3532-01-002 (33RF)\Survey\Plats\3532-03-001-ALTA-ZON.dwg | | | |
|---|---|---|---|
| BCG PROJECT NO.3532-03-001 | DSK:1 | BY:RJS | CHK:DZ | SHEET 1 OF 3 |

2641

BOOK 2001 PAGE 1137

THIS DEED, made this 15th, day of November , 1979 , by and between CHARLES A. LAUM and JENNIE K. LAUM, his wife

, parties of the first part, and

CHANNING D. STROTHER and CLARA S. STROTHER , his wife, as tenants by the entirety, parties of the second part.

WITNESSETH

That for and in consideration of the sum of Ten Dollars ($10.00) in hand paid, the receipt of which is hereby acknowledged, the parties of the first part do grant and convey in fee simple and with General Warranty of Title, unto the parties of the second part, as tenants by the entirety, with the full common law right of survivorship to the survivor of either of the parties of the second part, the following described property situate and being in the COUNTY of ARLINGTON , Virginia:

SEE ATTACHED SHEET FOR DESCRIPTION

This conveyance is made subject to a deed of trust recorded in Deed Book 1937, at Page 157, of the aforesaid County land records, securing an indebtedness in the original principal sum of $37,500.00; and a deed of trust recorded in Deed Book 1937, at Page 164, of the aforesaid County land records, securing an indebtedness in the original principal sum of $24,750.00, the balances of which the parties of the second part hereby assume and agree to pay us as evidenced by their acceptance of this deed.

This conveyance is made subject to the restrictions and conditions contained in the deeds forming the chain of title to this property.

The grantors covenant that they have the right to convey the aforesaid property unto the grantees; that the grantees shall have quiet possession thereof; that the said grantors ha ve done no act to encumber said land and that they will execute such further assurances of the land as may be requisite.

WITNESS the following signature(s) and seal(s):

_Charles A. Laum_ (SEAL)
CHARLES A. LAUM

_Jennie K. Laum_ (SEAL)
JENNIE K. LAUM

STATE OF VIRGINIA
COUNTY OF FAIRFAX , to-wit:

I, the undersigned, a Notary Public in and for the County and State aforesaid, do hereby certify that CHARLES A. LAUM and JENNIE K. LAUM, his wife

, whose names are signed to the above writing, bearing date on the 15th day of November , 19 79 , have personally appeared before me in my County aforesaid and acknowledged the same.

GIVEN under my hand and seal this 15th day of November 19 79.

My commission expires on the 21st day of September , 19 81.

_____
Notary Public

Wade P. Hoenshel, P.C.
Attorney at Law
Suite 110
Honeywell Center
306 Westpark Drive
McLean, Virginia 22101

Grantees' address: 2311 Chestnut Hill Ave., Falls Church, VA. 22043

2001-1137

EXHIBIT #2
Strother
7/10/09

DESCRIPTION                    BOOK 2001 PAGE 1138

BEGINNING at a point on the west side of Lot Two Hundred
Forty-Two (242), said point being North 0° 55' 30" East
78.0 feet from the southwest corner of said Lot No. 242;
thence, cutting across Lots 241 and 242; and following the
north line of the land heretofore conveyed to Enoch A. Norris,
south 89° 04' 30" West 32.31 feet to the northeast corner of
the land conveyed to Norris; thence north 0° 47' 15" East 40
feet, more or less, to a point in the southwest line of the
property of Judson Reamy; thence north 38° 44' West 12 feet, more
or less, to the corner of the said Reamy tract; thence, following
the line of said Reamy tract, North 51° 16' East 35.5 feet to
a point in the west side of North Irving Street (formerly Clarendon
Avenue); thence, following the said west side of said North
Irving Street, North 38° 44' West 14.0 feet to a point which is
the northeast corner of the land formerly owned by B. M. Hedrick;
thence, South 51° 16' West 66.48 feet to a point; thence south
89° 04' 30" West 2.52 feet to a point; thence south 0° 55' 30"
West 45.0 feet to the point of beginning, containing 4,585 square
feet of land, more or less, and being part of Lots 217, 241 and
242, of the subdivision of Clarendon, as the same appears duly
dedicated, platted and recorded in Deed Book 102, at Page 138,
of the land records of Arlington County, Virginia;

LESS AND EXCEPT from the above-described parcel, 42.8 square feet
of Lot 242, conveyed to Julius Rossen and Bernice Rossen by deed
recorded in Deed Book 1230, at Page 480, among the said County
land records;

AND

Parts of Lots numbered 242 and 241 of the subdivision of
CLARENDON, as said subdivision is duly dedicated, platted and
recorded in Deed Book 102, at Page 138 among the land records
of Arlington County, Virginia, and being described by metes
and bounds as follows:  BEGINNING at the southwest corner of
said lot 242; thence following the south line of said lot 89°
04' 30" East 32.48 feet to the center line of a brick wall which
is the party wall between the premises known as #10 and #12
Garrison Road; thence following the said center line and the
said line extended north 0° 47' 15" East 70 feet; thence north
89° 04' 30" West 32.31 feet to a point in the west line of said
lot 242; thence following the said west line of said lot south
0° 55' 30" West 70 feet to the point of beginning;

LESS AND EXCEPT from the above-described Parcel #2 42.8 square
feet recorded in Deed Book 1230, at Page 480; and

LESS AND EXCEPT, ALSO, 31 square feet recorded in Deed Book
1155, at Page 31, among the said County land records;

And being the same property conveyed to Charles A. Lause by
Deed Book 1967, at Page 259, of the aforesaid County land
records.

Walter F. Hodgkiss, P C
Attorney at Law
Suite 119
Heavywall Green
Mat Westpark Drive
McLean, Virginia 22101

ZOM Production 7-2-09
148 of 770



BOOK 2001 PAGE 1139

D E E D

CHARLES A. LAMB

TO

CHANNING D. STROTHER, ET UX

#10170

$130,000.00 Consideration

$ 46,693.86 Assumed

Kelley F. Russell, P.C.
7300 Heatgate Dr., #113
McLean, Virginia 22102

IN THE CLERK'S OFFICE OF THE CIRCUIT COURT OF THE COUNTY OF FAULL ...

... *this ... was presented, and, with the Certificate annexed, admitted to ......

... November 6, 1979 ... at ... 12:15 ... o'clock ... P ... M

CONSIDERATION ... 130,000.00

STATE TAX ... 195.00

COUNTY TAX ... 65.00

TRANSFER FEE ... 1.00

CLERK'S FEE ... 83.50

GRANTOR'S TAX ... 

TOTAL ... 354.50

Teste: *David A. Bell* Clerk