Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

(ALEXANDRIA DIVISION)

4    ------------------------X

5    SUN YUNG LEE,                :

6         Plaintiff,             :

7         vs.                    :   Case No. 1:09CV402

8    ZOM CLARENDON, L.P.,         :

9         Defendant.             :

10   ------------------------X

11                                      Tuesday, July 7, 2009

12                                      Arlington, Virginia

13   Deposition of:

14                   DONALD WILLIAMS,

15   a witness, called for examination by counsel for the

16   Defendant, pursuant to notice and agreement, in the

17   offices of Walsh, Colucci, Lubeley, Emrich & Walsh, P.C.

18   at 2200 Clarendon Boulevard, 13th Floor, Arlington,

19   Virginia  22201, beginning at approximately 12:43 o'clock

20   p.m., before Linda Marie Kia, a Certified Verbatim

21   Reporter and a Notary Public in and for the Commonwealth

22

23                                      LMK-107-09

EXHIBIT

C

25

1       A      No, never did.

2       Q      Okay.  Tell me something, did Mr. Strother

3 ever park in this area?

4       A      Yes, he did.

5       Q      For how long?

6       A      You know, for when he conduct business --

7 conduct his business.

8       Q      How often was his business open?  Do you

9 remember?

10      A      Probably Monday through Friday.

11      Q      Okay.  And so he would park there.  What

12 were his hours?  What do you remember?

13      A      You know, right -- I would guess like

14 eight to five, something like that, eight -- you know,

15 regular normal working hours.

16      Q      And can you mark on your exhibit where he

17 would normally park?

18      A      Okay.  He --

19              MR. CUMMINGS:  Draw a picture of a car?

20              BY MR. RINALDI:

21      Q      Yeah, draw a picture of a car.

22      A      (Complied with the request.)

23              Okay.  He would park down here.

26

1          Q          You sure of that?

2          A          Yes.

3          Q          Would he ever park in the area over there?

4          A          Sometimes he would park here.

5   (Indicating.)

6          Q          Okay.

7          A          You know, right here.   (Indicating.)

8          Q          Yeah?   Right up against the fence?

9          A          (No response.)

10                    MR. CUMMINGS:   Did you hear his last

11  question?

12                    THE WITNESS:   Against the fence?

13                    BY MR. RINALDI:

14         Q          Yeah.   Or close to it?

15         A          Yeah.

16         Q          Okay.

17         A          Nose in.

18         Q          How often would he -- and so he would do

19  that every Monday through Friday from eight to five?

20         A          Pretty much, yeah.

21         Q          Okay.   Would Mr. Lee ever tell him to move

22  his car?

23         A          No.

27

1        Q        Okay.  Would Mr. Strother ever park there

2   for more than just hours?  Would he park there for --

3   would he leave a car there when he took trips or anything

4   like that?

5             A        No.

6             Q        No?

7             A        No.

8             Q        He never left a car there for more than --

9             A        Sometime on a weekend --

10            Q        Yeah.

11            A        -- I might go down there and I would see

12   John, you know, parked there.  He might be working on a

13   weekend or something, doing something inside his shop

14   that, you know, he might be there.  But other than that -

15   -

16            Q        Okay.

17                 MR. CUMMINGS:  Other than that?  Can he

18   finished the answer?

19                 MR. RINALDI:  Sure.

20                 MR. CUMMINGS:  Other than?

21                 THE WITNESS:  Other than that it was

22   nothing out of the ordinary.

23                 BY MR. RINALDI:

28

1       Q      Well, what do you consider out of the

2  ordinary?

3       A      Well, you know, the regular nine to five,

4  you know, parking in that -- you know, parking and using

5  the --

6       Q      Did you ever know Strother to keep other

7  people off of this area, this alley way?

8       A      No.

9       Q      No?  Okay.

10       Would you ever use this alley way to get

11  to not the Reamy property but the -- but the Lee

12  property, the remainder of the Lee property?  In other

13  words, your testimony was you would go around and use the

14  alley way to get to the back door of the Reamy property.

15       A      Uh-huh.

16       Q      Would you ever use it to get to the rest

17  of the Lee property?

18       A      Yeah, because I could take that fence

19  down.

20       Q      How often did you do that?

21       A      A couple times.

22       Q      Like how many times?

23       A      Two, three times maybe.

29

1      Q     When?

2      A     I can't recall.

3      Q     So you would take -- so --

4      A     There is a section of fence that ran from

5 the corner to before it took that -- that we told the

6 fence guy to leave that section, that we could take that

7 off.

8      Q     Who was the fence guy?

9      A     Solis, I think.

10     Q     Okay.  Did you get a permit for that?

11       MR. CUMMINGS:  S-o-l-i-s?  Sorry.

12       THE WITNESS:  I think S-o-l-i-s.

13       BY MR. RINALDI:

14     Q     Okay.  Did you get a permit for the fence.

15     A     We told him to get the permits.

16     Q     Did he get the permits?

17     A     Don't know.

18     Q     Okay.

19     A     I'm assuming he did everything that he

20 should have done.  That's -- that's one of the reasons

21 that I didn't -- I didn't go with Long Fence because Long

22 Fence wouldn't get the permits.

23     Q     Okay.

36

1       A     Dates, times?

2       Q     Yeah.

3       A     No.

4       Q     Okay.  Here, let me get my pen back.

5       A     It was a good one.

6       Q     I'll give you one when we're done.  You

7 can have one.

8            Okay.  So where were we?  Would you ever

9 access the back of the Reamy property just by going

10 through the front door of the Reamy property?  In other

11 words, it has -- it has a front door; does it not?

12       A     Yes.

13       Q     And then you can get to the back door from

14 the front door; can you not?

15       A     Yes.

16       Q     Okay.  So wouldn't it also make sense to

17 just access the back of the property by going straight

18 through the Reamy property?

19       A     That would take longer.

20       Q     Okay.  But would you ever access the back

21 of the Reamy property by just going through the house?

22       A     I could.

23       Q     Did you?

59

1      Q      And the same goes for the door that's on

2  the southerly side of the west end of the house?

3      A      That swings in.

4      Q      That swings in too.  And that one, there

5  is no issue because the property line departs from the

6  Reamy property about three or four feet in from the

7  southerly side of the west end of the Reamy property; is

8  that correct?

9      A      Right.

10     Q      Okay, all right.

11            All right.  What kind of car do you drive?

12     A      A 1989 Chevy Suburban.

13     Q      When you're at work at Sam's Corner -- is

14  that at Sam's Corner?

15     A      Yes.

16     Q      Okay.  There's another place called Sam's

17  Corner somewhere.

18            When you're at work at Sam's Corner where

19  do you generally park?  And do you want to mark it here?

20     A      Yeah.  In the lot just to the south of the

21  Reamy property.

22     Q      Okay.  Do you do so generally in such a

23  way that it kind of blocks -- blocks what we're calling

60

1    the easement area, the alley way?

2            A       I park where I can.

3            Q       Okay.

4            A       Where people will let me, you know,

5    because we have other tenants parking there.

6            Q       Were you ever aware of John Strother

7    putting up no trespassing signs on his property anywhere?

8            A       I can't recall.

9            Q       On November 18th, 2008, your wife spoke at

10   a county board hearing regarding ZOM Clarendon's request

11   for a site plan amendment.

12           A       What was the date again?

13           Q       November 18th, 2008.

14           A       Okay.

15           Q       Do you ever remember her going to any

16   other Arlington County Planning Commission meetings or

17   any official public hearings on the site plan for the --

18   what I'll call the ZOM property, for that entire

19   property, at which anybody on behalf of the Lee family

20   objected?

21           A       No, because we were never notified of any

22   meetings.

23                   MR. CUMMINGS:  You said never or not

73

1                    THE WITNESS:   I midnight blue Chevy Crown

2    Victoria.

3                    BY MR. RINALDI:

4         Q         Okay, that's fine.

5                    MR. BURCHER:   Wait a minute.   There is no

6    Chevy Crown Victoria.

7                    BY MR. RINALDI:

8         Q         You mean a --

9         A         Or a Ford Crown Victoria.

10        Q         A Ford Crown Vic, okay.   Was it a surplus

11   cop car or no?

12        A         It drove like one.

13                                     (The document was marked

14                                      for identification as

15                                      Deposition Exhibit No. 4.)

16                    BY MR. RINALDI:

17        Q         All right.   I'm going to show you Exhibit

18   4.  Do you recognize this?

19        A         I do.

20        Q         What is it?

21        A         This is the -- this is the northwest

22   corner of the Reamy property.

23        Q         Okay.   Would you put a dot on the

74

1   northwest corner of the Reamy property?

2           A       What do you mean?  On this?

3           Q       Yeah.  Just -- yeah.  Where you would

4   estimate it is, just put a dot on the photograph.

5           A       What, the northwest?

6           Q       Yeah.  Where you've got your finger.

7           A       Right here.

8           Q       Okay.

9           A       This would be the northwest.

10          Q       Okay.

11          A       No.  It would be out here someplace.

12          Q       Okay.  So that's the corner of the

13  building and the corner of the property would be --

14          A       Yeah.  See, because that property comes

15  out.

16          Q       Just -- yeah, just generally.  I'm not

17  going to hold you to -- I understand that based on the

18  angle of it it's going to be difficult to --

19          A       I don't have my surveyors transom.

20          Q       Exactly.

21          A       Okay.

22          Q       I'm going to point to what appears to be a

23  fence post --

75

1       A       Correct.

2       Q       -- on the southwest corner of the Reamy

3   property.

4       A       Uh-huh.

5       Q       Is that the fence post to which the fence

6   that we've been discussing attached?

7       A       Yes.

8       Q       Okay.  Could you, to the best of your

9   ability, put a dot on the picture where the Strother

10  property and the Reamy property corner is, your best

11  guess?

12      A       Which corner?

13      Q       The -- let me see if I can get my bearings

14  right.  I haven't looked at a compass in a long time.

15  The east -- the western most boundary of the Lee

16  property.

17      A       (Complied with the request.)

18      Q       Okay.  Okay.

19              (Discussion off the record.)

20              THE WITNESS:  Approximately here because

21  the perspective is off.

22              BY MR. RINALDI:

23      Q       Yeah, just put a dot generally where

76

1    you're thinking of.

2         A       Yeah, the property line; correct?

3         Q       Yes.

4         A       You want property line?

5                 (Complied with the request.)

6         Q       Okay.  All right.  And then a dot where

7    the property line departs from the Reamy property and

8    heads in a southerly direction.  And if you can't do it,

9    just say I can't do it.  I mean, that's fine.

10                MR. CUMMINGS:  He might be able to.

11                MR. RINALDI:  I know.  If he can, I want

12   him to.

13                THE WITNESS:  It goes this way.

14                BY MR. RINALDI:

15        Q       Okay.

16        A       It goes this way.

17        Q       Okay.

18        A       South?  You want south?

19        Q       Yeah.

20        A       (Complied with the request.)

21        Q       Okay.  And that's towards the Strother

22   property?

23        A       No.

95

1    and once again my color blindness, in an area that looks

2    like it used to be paved there?

3            A       Asphalt, yeah.

4            Q       Is that the old asphalt that was -- that

5    was shown --

6            A       In the right-of-way.

7            Q       And that is also shown on the survey that

8    we've handed you?

9            A       Yes.

10           Q       Okay.  All right.  I've got no more

11   questions about that photograph.

12                                   (The document was marked

13                                   for identification as

14                                   Deposition Exhibit No. 10.)

15           BY MR. RINALDI:

16           Q       Here is Number 10.  Is this a photograph

17   of the west side of the Reamy property?

18           A       This is the southwest corner.

19           Q       Okay.  And is that fence --

20           A       The natural brick would be the west.  The

21   white would be the south side.

22           Q       Okay.  And is this post on the corner

23   where Mr. Lee's fence terminated?

96

1       A       Yes.

2       Q       Okay.  I'm going to move you to -- what

3    are we on, 10?

4                       THE COURT REPORTER:  Eleven.

5                               (The document was marked

6                               for identification as

7                               Deposition Exhibit No. 11.)

8                       BY MR. RINALDI:

9       Q       Eleven.  Is this just, for lack of a

10   better way to put it, a better view of Number 8?  Let's

11   see Number 8 was -- no, of Number 9?  I'm sorry, here you

12   go.

13      A       By better, if you're saying a better shot

14   of the west side of the right-of-way.

15      Q       Okay.

16      A       Yes.

17      Q       And the pole to the left of the photograph

18   is the pole that was a part of the -- the Lee -- the Lee

19   fence; is that correct?

20      A       The pole -- on Exhibit 11 the pole on the

21   left is the pole in Exhibit 9.

22      Q       Okay.  And so and the Reamy property is

23   visible to the right, to the far right?